## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHANGYOUNG JUNG, derivatively on behalf of ASSERTIO HOLDINGS, INC., | C.A. No. |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| DANIEL A. PEISERT, PAUL SCHWICHTENBERG, HEATHER L. MASON, WILLIAM T. MCKEE, PETER D. STAPLE, JAMES L. TYREE, and JEFFREY VACIRCA, | |
| Defendants, | |
| and | |
| ASSERTIO HOLDINGS, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Changyoung Jung ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Assertio Holdings, Inc. ("Assertio" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Daniel A. Peisert ("Peisert"), Paul Schwichtenberg ("Schwichtenberg"), Heather L. Mason ("Mason"), William T. McKee ("McKee"), Peter D. Staple ("Staple"), James L. Tyree ("Tyree"), and Jeffrey Vacirca ("Vacirca") (collectively, the "Individual Defendants," and together with Assertio, the "Defendants") for breaches of their fiduciary

1

duties as directors and/or officers of Assertio, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Peisert and Schwichtenberg for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Assertio, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Assertio's directors and officers from March 8, 2023 through November 8, 2023, inclusive (the "Relevant Period").

2.      Assertio is a Delaware corporation based in Lake Forest, Illinois that describes itself as a "leading commercial pharmaceutical company bringing differentiated products to patients." Further, the Company represents that it has a "robust portfolio of branded prescription neurology, inflammation and pain medications" along with an "interest[] in products across all therapeutic areas including [the Company's] current

focus."[1] One of the Company's core commercial products is Indocin® ("Indocin") which is an oral or suppository drug that is purportedly used for the treatment of "[m]oderate to severe rheumatoid arthritis including acute flares of chronic disease, [m]oderate to severe ankylosing spondylitis, [m]oderate to severe osteoarthritis, [a]cute painful shoulder (bursitis and/or tendinitis), and [a]cute gouty arthritis."[2] However, to date, there have been no patents filed for Indocin products, leaving the Company at risk of having competitors produce and sell generic versions of Indocin.

3.      On March 8, 2023, Assertio published its annual report on Form 10-K with the SEC, which reported Assertio's financial results for the year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K represented that "[f]or the year ended December 31, 2022, product sales primarily consisted of sales from INDOCIN products," among others. Moreover, the 2022 10-K represented that Indocin net product sales had increased $39.8 million between 2021 and 2022 fiscal years, from $60.6 million in 2021 to $100.3 million in 2022.

4.      Later, on May 9, 2023, the Company issued a press release announcing that it was raising its full-year net product sales and adjusted EBITDA outlook. In describing the reasons for the adjustment, the press release represented that Assertio's "[f]irst quarter net product sales performed above internal expectations" which was largely driven by "continued growth of Indocin."

5.      On July 31, 2023, Assertio acquired biopharmaceutical company Spectrum Pharmaceuticals, Inc. ("Spectrum"), thereby expanding Assertio's drug portfolio to include

---

[1] https://www.assertiotx.com/about/overview/
[2] https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=06de3c9d-63bf-47c1-f78c-4fbdd482928a##

Spectrum's product ROLVEDON® ("Rolvedon"), an injection that purportedly decreased the incidence of infection as manifested by febrile neutropenia, a serious complication often resulting from chemotherapy.[3] Following the acquisition, Defendant Peisert, the Company's then-Chief Executive Officer ("CEO"), expressed Assertio's excitement regarding Rolvedon's launch and emphasized that the Company sought to expand on that successful launch to propel its business and contribute to Assertio's adjusted earnings per share and cash flow.

6.      However, on August 3, 2023, Zydus Lifesciences Limited ("Zydus"), a pharmaceutical company engaged in the manufacture of generic drugs, received U.S. Food and Drug Administration ("FDA") approval to manufacture and market a 50 mg, suppository generic version of Indocin (the "generic Indocin"). Further, the FDA classified the generic Indocin as a Competitive Generic Therapy ("CGT") drug product which triggered and granted to Zydus exclusivity to market the product for a period of 180 days. As a result of this grant from the FDA, the Company withdrew its projected financial outlook previously released in May 2023.

7.      On this news, the Company's stock price fell $2.44 per share, or 45.61%, from closing at $5.35 per share on August 3, 2023, to close at $2.91 per share on August 4, 2023.

8.      The truth fully emerged on November 8, 2023 when Assertio issued a press release announcing the Company's financial results for the third quarter of 2023. In the press release's introductory remarks, Defendant Peisert noted the Company's disappointment regarding the quarterly financial results, stating that "[Assertio's] third

---

[3] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5871243/

quarter results were disappointing, with the loss of Indocin exclusivity and Rolvedon results below expectations driving significant charges to [Assertio's] net income." The press release also represented that the Company's revenue as of the end of September 2023 was $35,627,000—missing consensus estimates by $14.8 million—and adjusted earnings per share (non-GAAP) was $0.01, which was significantly lower compared to the 2022 adjusted earnings per share (non-GAAP) of $0.22 for the same quarter and which missed consensus estimates by $0.09.

9.      On this news, the Company's stock price fell $0.92 per share, or 43.19%, from closing at $2.13 per share on November 8, 2023, to close at $1.21 per share on November 9, 2023.

10.     Less than two months later, on January 3, 2024, the Company issued a press release announcing that Defendant Peisert was stepping down as Assertio's CEO and that Defendant Mason was being appointed as Assertio's interim CEO.

11.     On this news, the Company's stock price fell $0.11 per share, or 10.89%, from closing at $1.01 per share on January 3, 2024, to close at $0.90 per share on January 4, 2024.

12.     Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company had overestimated the profitability of Indocin due to the FDA approval of a generic counterpart;

5

(2) due to this miscalculation and the overall threat of generic competition, the Company's dependence on Indocin to boost its net income was not sustainable; (3) the Company's expansion of its portfolio to include Rolvedon would not positively impact the business' prospects and cash flow; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, five of the Individual Defendants engaged in improper insider sales, netting personal proceeds of approximately $1,781,378.

14.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

15.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former CEO, and its current Senior Vice President ("SVP") and Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of Illinois (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

16.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the CFO's and former CEO's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of Assertio's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of Assertio. Plaintiff has continuously held Assertio common stock at all relevant times.

### Nominal Defendant Assertio

23.     Nominal Defendant Assertio is a Delaware corporation with its principal executive offices located at 100 S. Saunders Road, Suite 300, Lake Forest, IL 60045. Assertio's shares trade on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "ASRT."

### Defendant Peisert

24.     Defendant Peisert served as the Company's President and CEO from December 14, 2020 until he separated from the Company effective January 2, 2024. Defendant Peisert also served as a Company director from December 14, 2020 until he resigned effective January 24, 2024. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 3, 2023 (the "2023 Proxy Statement"), as of March 31, 2023, Defendant Peisert beneficially owned 312,364 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 31, 2023 was $6.37, Defendant Peisert beneficially owned approximately $1,989,759 worth of Assertio stock as of that date.

25.     For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Peisert received $5,993,818 in total compensation from the Company. This included $589,990 in salary, $137,500 in bonus, $2,095,817 in stock awards, $1,717,937 in option awards, $1,427,865 in non-equity incentive plan compensation, and $24,709 in all other compensation.

26.     During the Relevant Period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Peisert made the following sales of Company stock at artificially inflated prices:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| September 11, 2023 | 127,281 | $3.04 | $386,934.24 |
| September 12, 2023 | 31,121 | $2.97 | $92,429.37 |

Thus, in total, before the fraud was exposed, he sold 158,402 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $479,364. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

27.     The Company's 2023 Proxy Statement stated the following about Defendant Peisert:

> *Daniel A. Peisert* has served as a director and President and Chief Executive Officer of the Company since December 14, 2020. Mr. Peisert previously served as the Company's Executive Vice President and Chief Financial Officer from June 2020 to December 2020, its Senior Vice President and Chief Financial Officer from December 2018 to June 2020, its Senior Vice President, Business Development from August 2018 to November 2018 and

its Vice President, Business Development from September 2017 to August 2018. Prior to joining the Company, from October 2016 to September 2017, Mr. Peisert served as Vice President, US Legacy Pharmaceuticals for Concordia International Corp., an international specialty pharmaceutical company. Prior to this, from March 2014 to October 2016, he was Vice President, Business Development for Concordia. From February 2012 to February 2014, Mr. Peisert served as a Research Analyst for Cupps Capital and from 2012 to 2013 he served as a member of the board of directors and secretary of SureGene LLC. From 2008 to 2012, Mr. Peisert was Director of Finance and Business Development for Marathon Pharmaceuticals, LLC a privately-held specialty pharmaceutical company. Prior to entering the pharmaceutical industry, he was a healthcare equity analyst and portfolio manager for Magnetar Capital and UBS O'Connor and began his career as an auditor for PricewaterhouseCoopers. The Board considered Mr. Peisert's experience and expertise within the following areas relevant to the Company and its business in concluding that he should serve on the Board: Corporate Management; Corporate Operations; Financial Management; Mergers and Acquisitions; and Corporate Strategy. Mr. Peisert holds a B.S. in Business with an emphasis on Accounting from the University of Minnesota.

**Defendant Schwichtenberg**

28.    Defendant Schwichtenberg has served as the Company's SVP and CFO since March 11, 2021. Defendant Schwichtenberg also previously served as the Company's Vice President of Finance from April 2018 to March 11, 2021. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Schwichtenberg beneficially owned 104,980 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 31, 2023 was $6.37, Defendant Schwichtenberg beneficially owned approximately $668,723 worth of Assertio stock as of that date.

29.    For the 2022 Fiscal Year, Defendant Schwichtenberg received $2,138,318 in total compensation from the Company. This included $359,365 in salary, $44,250 in bonus, $747,954 in stock awards, $609,484 in option awards, $354,266 in non-equity incentive plan compensation, and $22,998 in all other compensation.

30.     During the Relevant Period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Schwichtenberg made the following sales of Company stock at artificially inflated prices:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| September 11, 2023 | 104,980 | $3.07 | $322,288.60 |

Thus, in total, before the fraud was exposed, Defendant Schwichtenberg sold 104,980 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $322,289. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

31.     The Company's 2023 Proxy Statement stated the following about Defendant Schwichtenberg:

> *Paul Schwichtenberg* has served as the Company's Senior Vice President, Chief Financial Officer since March 11, 2021, prior to which he served as the Company's Vice President, Finance from April 2018 when he joined the Company. Prior to joining the Company, he served as Director of Pricing and Planning for AbbVie, a biopharmaceutical company, from October 2013 to April 2018 where he led the U.S. Commercial Pricing Team. Prior to this, Mr. Schwichtenberg served as Controller for Radio Flyer, Inc., a consumer products company, from October 2010 to October 2013. From 2000 to October 2010, Mr. Schwichtenberg served at Takeda Pharmaceuticals in various roles of increasing responsibility, most recently as Senior Director and Controller. Prior to entering the pharmaceutical industry, he served as a senior auditor at Wolf & Company LLP. Mr. Schwichtenberg holds a B.S. degree in Business Administration from Roosevelt University and is a certified public accountant (CPA).

**Defendant Mason**

32.     Defendant Mason has served as the Company's Interim CEO since January 2, 2024 and as a Company director since February 2019. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Mason beneficially owned 159,456 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 31, 2023 was $6.37, Defendant Mason beneficially owned approximately $1,015,735 worth of Assertio stock as of that date.

33.     For the 2022 Fiscal Year, Defendant Mason received $283,192 in total compensation from the Company. This included $92,500 in fees earned or cash and $190,692 in stock awards.

34.     During the Relevant Period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Mason made the following sales of Company stock at artificially inflated prices:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| May 19, 2023 | 89,286 | $7.30 | $651,787.80 |

Thus, in total, before the fraud was exposed, Defendant Mason sold 89,286 shares of Company common stock at artificially inflated prices on inside information, for which she received approximately $651,788. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

35.     The Company's 2023 Proxy Statement stated the following about Defendant Mason:

*Heather L. Mason* has served as a director of the Company since February 2019. Ms. Mason is a former senior executive of Abbott Laboratories, a multinational medical devices and health care company, having retired as Executive Vice President of Abbott Nutrition in October 2017, a role she held since April 2015. From June 2014 to April 2015, Ms. Mason served as Executive Vice President, Global Commercial Operations, prior to which she served as Senior Vice President of Abbott Diabetes Care from May 2008 to June 2014. Ms. Mason joined Abbott in 1990 and held a number of positions in Abbott's U.S. pharmaceutical business. Prior to joining Abbott, Ms. Mason worked for Quaker Oats, FMC Corporation, and Commonwealth Edison. Ms. Mason serves as a director and member of the audit committee of Convatec Group PLC, a publicly-held medical device company. She also serves as a director and member of the audit and compensation committees of Immatics NV, a publicly- held biotechnology company. Ms. Mason also serves as a director and member of the compensation committee of Pendulum Therapeutics and as the chair of SCA Pharmaceuticals, LLC, both privately held. The Board considered Ms. Mason's experience and expertise within the following areas relevant to the Company and its business in concluding that she should serve on the Board: Corporate and Executive Management; Operational and Strategic Planning; and Corporate Leadership. Ms. Mason holds a B.S.E. in Industrial Engineering from the University of Michigan and an M.B.A. from the University of Chicago.

### Defendant McKee

36.     Defendant McKee has served as a Company director since March 2017. He also serves as the Chair of the Audit Committee, as Chair of the Nominating and Corporate Governance Committee, and as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant McKee beneficially owned 34,334 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 31, 2023 was $6.37, Defendant McKee beneficially owned approximately $218,708 worth of Assertio stock as of that date.

37.     For the 2022 Fiscal Year, Defendant McKee received $276,692 in total compensation from the Company. This included $86,000 in fees earned or cash and $190,692 in stock awards.

38.     During Relevant Period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant McKee made the following sales of Company stock at artificially inflated prices:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| August 14, 2023 | 22,000 | $3.14 | $69,080 |

Thus, in total, before the fraud was exposed, Defendant McKee sold 22,000 shares of Company common stock at artificially inflated prices on inside information, for which he received $69,080. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

39.     The Company's 2023 Proxy Statement stated the following about Defendant McKee:

*William T. McKee* has served as a director of the Company since March 2017. He currently serves as Chief Executive Officer of MBJC Associates, LLC, a business consulting firm serving pharmaceutical and biotech companies. Mr. McKee served as Chief Financial Officer of C4 Therapeutics, Inc., a biopharmaceutical company, from July 2020 until June 2021. Mr. McKee served as Chief Operating Officer and Chief Financial Officer for EKR Therapeutics, Inc., from July 2010 until June 2012 when EKR was sold to Cornerstone Therapeutics Inc. Until March 2010, Mr. McKee served as the Executive Vice President, Chief Financial Officer and Treasurer of Barr Pharmaceuticals, Inc., a subsidiary of Teva Pharmaceutical Industries Limited, and the successor entity to Barr Pharmaceuticals, Inc., which was acquired by Teva in December 2008. Mr. McKee was also Executive Vice President and Chief Financial Officer of Barr prior to its acquisition by Teva, after having served in positions of increasing responsibility at Barr from 1995 until its acquisition. Prior to joining Barr, Mr. McKee served as a Director of International Operations and Vice President Finance at Absolute Entertainment, Inc. from June 1993 until December 1994. From 1990 until June 1993, Mr. McKee worked at Gramkow & Carnevale, CPAs, and from 1983 until 1990, he worked at

Deloitte & Touche. Mr. McKee serves as a director and chair of the audit committee of Aileron Therapeutics, Inc., a publicly-held biopharmaceutical company. Mr. McKee serves as a Venture Partner for Cobro Ventures, a private investment firm focused on software and biotech, and a board member of two of its privately-held portfolio companies, NextRNA Therapeutics and Windgap Medical, Inc. He also serves as a board observer of MedRhythms, Inc. and as a director of Vinci Therapeutics, both privately held. From 2014 to June 2020, Mr. McKee served as a director and member of the audit and compensation committees of Agile Therapeutics, Inc., a publicly-held specialty biopharmaceutical company. The Board considered Mr. McKee's experience and expertise within the following areas relevant to the Company and its business in concluding that he should serve on the Board: Corporate Management; Corporate Operations; Financial Management; Mergers and Acquisitions; Corporate Strategy; and Board and Board committee experience. Mr. McKee holds a B.S. from the University of Notre Dame and is NACD Directorship Certified®.

### Defendant Staple

40.     Defendant Staple has served as a Company director since November 2003. He also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Staple beneficially owned 194,210 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 31, 2023 was $6.37, Defendant Staple beneficially owned approximately $1,237,118 worth of Assertio stock as of that date.

41.     For the 2022 Fiscal Year, Defendant Staple received $298,192 in total compensation from the Company. This included $107,500 in fees earned or cash and $190,692 in stock awards.

42.     The Company's 2023 Proxy Statement stated the following about Defendant Staple:

*Peter D. Staple* has served as a director of the Company since November 2003. Mr. Staple served as President and Chief Executive Officer of Corium, Inc., a biopharmaceutical company focused on transdermal

delivery systems and related technologies to address unmet medical needs from March 2008 to April 2019, and served as a member of the Corium, Inc., Board of Directors from 2008 through May 2020. Mr. Staple serves as a director and member of the audit, nominating and investment committees of Kyto Technology and Life Science, Inc., a privately-held company focused on the development of early stage technology and life science businesses. He also currently serves on the Board of Directors of privately held Kyto Investments, Inc., Corsair Pharma, Inc. and Lygos, Inc. From 2002 to March 2008 he served as director, and from 2002 to November 2007 as Chief Executive Officer, of BioSeek, Inc., a privately-held drug discovery company. From 1994 to 2002, Mr. Staple was a member of the senior executive team at ALZA Corporation, where he was most recently Executive Vice President, Chief Administrative Officer and General Counsel. Prior to joining ALZA, Mr. Staple held the position of Vice President, Associate General Counsel for Chiron Corporation, a biopharmaceutical company. Mr. Staple previously served as Vice President and Associate General Counsel for Cetus Corporation, a biotechnology company. The Board considered Mr. Staple's experience and expertise within the following areas relevant to the Company and its business in concluding that he should serve on the Board: Corporate Management; Corporate Governance; Strategic Transactions; Corporate Finance; Intellectual Property; and Board and Board committee experience. Mr. Staple holds a B.A. and a J.D. from Stanford University.

### **Defendant Tyree**

43.     Defendant Tyree has served as a Company director since October 2016. He also serves as Chair of the Compensation Committee. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Tyree beneficially owned 124,165 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 31, 2023 was $6.37, Defendant Tyree beneficially owned approximately $790,931 worth of Assertio stock as of that date.

44.     For the 2022 Fiscal Year, Defendant Tyree received $265,692 in total compensation from the Company. This included $75,000 in fees earned or cash and $190,692 in stock awards.

45.     During the Relevant Period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Tyree made the following sales of Company stock at artificially inflated prices:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| May 5, 2023 | 43,143 | $6.00 | $258,858 |

Thus, in total, before the fraud was exposed, Defendant Tyree sold 43,143 shares of Company common stock at artificially inflated prices on inside information, for which he received $258,858. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

46.     The Company's 2023 Proxy Statement stated the following about Defendant Tyree:

*James L. Tyree* has served as a director of Assertio since October 2016. Mr. Tyree served as co-founder and managing partner of Tyree & D'Angelo Partners, a private equity investment firm, from 2013 to July 2020. Prior to founding Tyree & D'Angelo Partners, Mr. Tyree was Executive Vice President and President of Abbott Biotech Ventures, a subsidiary of Abbott Laboratories focused on investments in early stage pharmaceuticals and biologics. Prior to that, Mr. Tyree held numerous executive positions at Abbott, including Executive Vice President Global Pharmaceuticals, Senior Vice President Global Nutrition, Corporate Vice President Pharmaceutical and Nutritional Products Group, Business Development and Divisional Vice President and General Manger, Japan. Prior to rejoining Abbott in 1997, Mr. Tyree was the President of SUGEN, Inc. and held management positions in Bristol-Myers Squibb, Pfizer, and Abbott. Mr. Tyree serves as non-executive chairman of Genelux Corp., a publicly-held biopharmaceutical company. He also served as lead independent director ChemoCentryx, Inc., a publicly-held biopharmaceutical company, from 2012 until it was acquired by Amgen in 2022. The Board considered Mr. Tyree's experience and expertise within the following areas relevant to the Company and its business in concluding that he should serve on the Board:

Healthcare Acquisitions; Corporate Management; Financial Management; Commercial Operations; Commercial Strategy; and Board and Board committee experience. Mr. Tyree holds a B.S. and an M.B.A. from Indiana University.

**Defendant Vacirca**

47.     Defendant Vacirca has served as a Company director since July 2023.

48.     The Company's website states the following about Defendant Vacirca:

Jeffrey Vacirca, MD, FACP, is a renowned cancer physician and visionary leader with extensive experience and commitment to community oncology. Dr. Vacirca assumed the role of CEO and Chairman of the Board of New York Cancer & Blood Specialists (NYCBS) in 2008. After two years, the practice emerged as a stronger unified group of physicians dedicated to reinventing themselves as the premier cancer care deliverers of New York.

Dr. Vacirca takes action against key billings, including abuse of pharmacy benefit managers (PBMs) and sequester cuts. He formed the Conquering Cancer PAC, which advocates for cancer patients and strives to ensure access and availability for all patients no matter where they live.

He also serves on the board of directors of Annexus Health, OneOncology, and the American Red Cross of Greater New York. Most of his roles in these remarkable companies focus on legislative advocacy for the cost of cancer care and access. Dr. Vacirca is the immediate past president of the Community Oncology Alliance (COA) and continues to be a member of their executive committee. He serves on the board of Scientific Advisory for Caris Life Sciences, and is president and co-founder of the National Translational Research Group. He has also been part of early funding for remarkable companies, including Cedar, Thyme Care, and Sherpa Health. Dr. Vacirca co-founded Odonate Therapeutics in 2016.

Dr. Vacirca is the founder and Chairman of the Board of Directors of the New York Cancer Foundation, which provides financial assistance to patients undergoing treatment for cancer. In addition, Dr. Vacirca is the Medical Director of Oncology Network Development at Mount Sinai Health Network and Lab Director for the Long Island Association for AIDS Care (LIAAC).

Dr. Vacirca was honored as Humanitarian of the Year by the American Red Cross and received its Corporate Leadership Award on behalf of NYCBS. He was awarded the Red Door Award for Leadership and Cancer Advocacy by the Red Door Community and received the Founders Medalist by The Brooklyn Hospital. Dr. Vacirca also received the Theodore Roosevelt Award for outstanding dedication to patient care and was named Newsday's

Top Doctor. He was also honored for his role in enabling the Long Island Association for AIDS Care staff to bring state-of-the-art HIV testing to New York.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

49.     By reason of their positions as officers and/or directors of Assertio and because of their ability to control the business and corporate affairs of Assertio, the Individual Defendants owed Assertio and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Assertio in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Assertio and its shareholders so as to benefit all shareholders equally.

50.     Each director and officer of the Company owes to Assertio and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Assertio, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

52.     To discharge their duties, the officers and directors of Assertio were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

53.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its

property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Assertio, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Assertio's Board at all relevant times.

54.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

55.     To discharge their duties, the officers and directors of Assertio were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Assertio were required to, among other things:

(a)      ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Illinois, and the United States, and pursuant to Assertio's own Code of Ethics and Business Conduct;

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Assertio conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Assertio and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Assertio's operations would comply with all applicable laws and Assertio's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

56.     Each of the Individual Defendants further owed to Assertio and the shareholders the duty of loyalty requiring that each favor Assertio's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

57.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Assertio and were at all times acting within the course and scope of such agency.

58.     Because of their advisory, executive, managerial, and directorial positions with Assertio, each of the Individual Defendants had access to adverse, non-public information about the Company.

59.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Assertio.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

60.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in

concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

61.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Assertio was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of

that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

64.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Assertio and was at all times acting within the course and scope of such agency.

## ASSERTIO'S CODE OF CONDUCT

65.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct"), applies to "all directors, officers and employees of the Company, as well as designated contract representatives and agents" of the Company.

66.     The Code of Conduct starts with an introduction which provides as to the "General Statement of Company Policy," that:

> Assertio Holdings, Inc. (the "Company") requires lawful and ethical behavior at all times. The purpose of this Code of Business Conduct and Ethics ("Code of Conduct") is to provide you with a statement of certain key policies and procedures of the Company for you to follow in conducting business in a legally and ethically appropriate manner. This Code of Conduct is intended as one element in the Company's efforts to ensure lawful and ethical conduct on the part of you and the Company.

(Emphasis in original.)

67.     The Code of Conduct provides, as to "Lawful and Ethical Behavior," that:

> The foundation on which this Code of Conduct is built is obeying the law and acting ethically. It is the Company's policy that you conduct business in accordance with applicable federal, state and local laws, rules and regulations and with the laws, rules and regulations of other countries in which the Company does business which are not in conflict with your responsibilities under United States laws and regulations. In addition, the Company's policy requires that you adhere to the highest standard of business ethics and conduct[.]

68.     The Code of Conduct provides, as to "Code of Ethics," that:

> This Code of Ethics is promulgated by the Board of Directors under Section 406 of the Sarbanes Oxley Act of 2002 and the rules of the SEC

promulgated thereunder and applies to all employees, officers and directors of the Company. It should be read in conjunction with the rest of this Code of Conduct and it contains standards reasonably necessary to promote:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- Full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by the issuer and in other public communications; and
- Compliance with applicable governmental laws, rules and regulations[.]

69. The Code of Conduct provides, as to "Confidential Information and Intellectual Property," that:

Confidential Information. Confidential information of the Company is an important corporate asset that merits the same protection as the Company's physical assets. You have entered into a non-disclosure or confidentiality agreement detailing your obligations regarding the Company's confidential information, and you must adhere to this agreement.

You are responsible for safeguarding the confidential information. This includes confidential information that belongs to the Company, its suppliers, its customers, and even fellow employees. The Company's information, products, services, ideas, and concepts are important proprietary assets for the Company. Various laws enable the Company to protect these assets. Examples of confidential or proprietary information include marketing plans and strategies, sales and marketing data, customer and employee records, research and technical data, manufacturing techniques, pricing information, information pertaining to business development opportunities, and new products and services[.]

70. The Code of Conduct provides, as to "Compliance with Laws, Regulations and Industry Codes," and specifically under the heading "Fair Competition Laws and Fair Dealing," that:

The Company is committed to conducting its business activities in accordance with applicable federal, state and local laws and regulations. You are expected to have a level of familiarity with important laws and regulations applicable to your duties for the Company that is appropriate for your position. You may contact the Legal Department with any questions regarding laws and regulations applicable to your duties.

*          *          *

*Fair Competition Laws and Fair Dealing*

*          *          *

You should always be fair in your dealings with clients, customers, suppliers, competitors, and any other third parties. You may not engage in the practice of manipulation, concealment, abuse of privileged information, misrepresentation, or any other unfair-dealing practice[.]

(Emphasis on original.)

71.      The Code of Conduct provides, as to "Maintain[ing] Accurate Books and Records," that:

> ***All Company books, records and accounts must be accurate and complete,*** and transactions must be recorded in a timely manner. As noted in the Company's Code of Ethics, ***the Company requires full, fair, accurate, timely and understandable recording and reporting of all Company information.*** You must act in a manner that ensures that all of the Company's books, records, accounts and financial statements are maintained in reasonable detail, appropriately reflect the Company's transactions and conform both to applicable legal requirements and to the Company's system of internal controls.
>
> You must execute and record transactions in accordance with all internal control procedures implemented by Company management. ***You are personally responsible for the integrity of the information, reports, and records under your control. You must never make any false or artificial entries for any purpose.***
>
> All of your expense reimbursements must accurately reflect the true nature and amount of the expenses. In addition, if you are in any way involved in preparing the Company's disclosure documents (such as SEC filings or press releases), you must produce full, fair, accurate, timely and understandable disclosure in such documents. The Company's financial statements must be prepared in accordance with generally accepted accounting principles and must represent, in all material respects, the financial condition and results of the Company.
>
> Company records must be maintained, stored and, when appropriate, destroyed in compliance with applicable laws and regulations (e.g., drug regulatory, environmental, tax, employment, government programs, and trade relations) and Company policy concerning record and document retention. You must not destroy records that are potentially relevant to a

26

violation of the law, any litigation, or any pending, threatened, or foreseeable government investigation or proceeding. It is a crime to alter, destroy, modify or conceal documentation or other objects that are relevant to a government investigation, or to otherwise obstruct, influence or impede an official proceeding. The law applies equally to all Company records, including formal reports as well as informal data such as e-mail, expense reports and internal memos.

*It is very important that you do not create, or participate in the creation, or perpetuation of, any records that are intended to mislead anyone or conceal any improper act or conduct.*

(Emphasis added.)

72.     The Code of Conduct provides, as to "Securities Laws and Prohibition of

Insider Trading," that:

*It is against federal law and Company policy to trade securities on the basis of material non-public information*. The Company's policy is that *you cannot buy or sell Company stock or other securities while in possession of material non-public information*. Insider trading is taken very seriously by the federal government and is punishable by fine and/or imprisonment.

The rules relating to trading in the Company's securities and those of other companies with which the Company does business are covered in detail in the Company's policy entitled "Insider Trading Policy" (the "Insider Trading Policy"). You must become familiar with the Insider Trading Policy and comply with it. If you are uncertain about the legal rules involving your purchase, sale or transfer of any securities of the Company or any securities in companies that are familiar to you by virtue of your work for the Company, you should consult with the Insider Trading Compliance Officer identified in the Insider Trading Policy before making any such purchase or sale.

(Emphasis added but underline on original.)

73.     The Code of Conduct provides, as to "Conflicts of Interest," that:

The Company knows that it can only be truly successful through the diligence and loyalty of its employees. Therefore, you must put the best interests of the Company at the forefront of any work-related activity or decision and be able to identify and appropriately handle conflicts of interest[.]

74.     The Code of Conduct provides, as to "Corporate Opportunities," that:

You must not (a) take for yourself personally opportunities that are discovered through the use of corporate property, information or position, (b) use corporate property, information or position for personal gain or (c) compete with the Company. You owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

75.     The Code of Conduct provides, as to "Reporting Violations," that:

This Code of Conduct applies to all officers, employees, contract representatives, and agents of the Company.

You must immediately report any violations or potential violations of this Code of Conduct, any applicable law or regulation, or a Company policy or procedure, including the CCP, to your supervisor, the General Counsel, the Compliance Officer or, as applicable, the Chairman of the Audit Committee[.]

76.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, five of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Additionally, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

**ASSERTIO'S AUDIT COMMITTEE CHARTER**

77.     The Company's Audit Committee Charter states that the purpose of the Audit Committee is "to assist the Board in fulfilling its audit oversight responsibilities."

78.     The Audit Committee Charter outlines the responsibilities of the Audit

Committee, stating that:

> In its audit oversight role, the Committee shall have the principal duties and
> responsibilities set forth below.
> - Review the audits of the Company's financial statements and the
>   integrity of the Company's financial statements, financial reporting
>   and accounting processes, and systems of internal controls regarding
>   finance and accounting.
> - Review the independence, qualifications and performance of the
>   Company's independent auditor and the personnel performing the
>   internal audit function.
> - Facilitate communication among the independent auditor,
>   management, the personnel responsible for the internal audit
>   function and the Board.
> - Assist the Board in the oversight of the Company's compliance with
>   applicable legal, regulatory and tax requirements with respect to the
>   above denoted areas, as delineated by the Board and management
>   from time to time.
> - Prepare the report that is required to be included in the Company's
>   annual proxy statement (or, if not previously provided during the
>   fiscal year, any other proxy statement or consent statement relating
>   to the election of directors) pursuant to the rules and regulations of
>   the Securities and Exchange Commission (the "SEC")[.]

79.     Specifically, the Audit Committee Charter provides, under the heading,

"Responsibilities," that:

> **<u>Responsibilities</u>**
> The Committee, to the extent it deems necessary or appropriate, shall:
>
> **A. Oversight of the Company's Relationship with the Independent
>    Auditor**
>
> 1. Appoint (and recommend that the Board submit for stockholder
>    ratification), compensate, retain and oversee the work of the
>    independent auditor (including resolution of any disagreements
>    between management and the independent auditor regarding
>    financial reporting), evaluate the performance of the independent
>    auditor and, if so determined by the Committee, replace the
>    independent auditor; it being acknowledged that the independent
>    auditor is ultimately accountable to the Board and the Committee,
>    as representatives of the stockholders. The independent auditor will
>    report directly to the Audit Committee.

2. Discuss with the independent auditor any disclosed relationships or services that may affect the independence and objectivity of the independent auditor and take appropriate actions to oversee the independence of the independent auditor.

3. Review and evaluate the lead audit partner of the independent auditor and assure the regular rotation of the lead audit partner, the concurring partner and other audit partners engaged, to the extent required by law, and further consider whether, in order to assure continuing auditor independence, there should be regular rotation of the audit firm itself.

4. Discuss with the Chief Executive Officer (the "CEO"), the CFO and other relevant company personnel their views as to the competence, performance and independence of the independent auditor.

5. Review and pre-approve both audit and permitted non-audit services to be provided by the independent auditor. The Committee may adopt policies and procedures for the approval of such services which may include delegation of authority to a designated member or members of the Committee to approve such services so long as any such approvals are disclosed to the full Committee at its next scheduled meeting. The Committee will pre-approve and regularly review the amounts of fees paid to the independent auditor for audit and non-audit services.

6. Ensure the receipt of, and evaluate the written disclosures and the letter that the independent auditor submits to the Committee regarding the auditor's independence in accordance with the rules of the Public Company Accounting Oversight Board ("PCAOB"), discuss such disclosures and letter with the independent auditor, oversee the independence of the independent auditor and, if so determined by the Committee in response to such disclosures and letter, take appropriate action to address issues raised by such evaluation.

7. Establish policies for the hiring of employees and former employees of the independent auditor and review and discuss with management the Company's compliance with such policies.

**B. Financial Statements and Disclosure Matters**

1. Review and discuss with management and the independent auditor the Company's annual audited financial statements, including disclosures made in management's discussion and analysis, and

recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K. Review should include discussion with management and independent auditors of significant issues regarding accounting principles, practices and judgments. The Committee should consider the independent auditor's judgments about the quality and appropriateness of the Company's accounting principles as applied in its financial reporting.

2.  Review and discuss with management and the independent auditor the Company's quarterly unaudited financial statements prior to the filing of the Form10-Q.

3.  Review and discuss quarterly reports from the independent auditor on: (i) all critical accounting policies and practices used; (ii) all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and (iii) other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

4.  Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles.

5.  Discuss with the independent auditor the matters required to be discussed by the applicable Auditing Standards adopted by the PCAOB related to the conduct of the audit, including: any difficulties encountered in the course of the audit work; restrictions on the scope of activities or access to required information; or any significant disagreements with management.

6.  Discuss with management and the independent auditor the adequacy of internal financial controls; and the adequacy of the disclosure of off-balance sheet transactions, arrangements, obligations and relationships in reports filed with the Commission.

7.  Review disclosures made to the Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein, and any fraud involving management or other employees who have a

significant role in the Company's internal controls over financial reporting.

8.  Obtain assurance from the independent auditor that the audit was conducted in a manner consistent with Section 10A of the Exchange Act.

9.  Review with financial management and the independent auditor the Company's quarterly and year-end financial results prior to the public release of earnings. The Committee will discuss with management earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and ratings agencies. Such discussion may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

10. Ensure that a public announcement of the Company's receipt of an audit opinion that contains a going concern qualification is made promptly in accordance with required disclosure obligations.

11. Obtain from management and the independent auditor a periodic update on current developments in accounting and regulatory requirements, including accounting standards and financial legislation or regulations, and assess the impact of any such developments on the Company and the Company's financial statements and disclosures.

12. Review the effect of regulatory and accounting initiatives, as well as off balance sheet structures, on the Company's financial statements.

13. Review and discuss with management SEC comment letters or other communications regarding the Company's public filings and the Company's responses thereto.

14. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies or published reports that raise material issues regarding the Company's financial statements or accounting policies.

## C.  Internal Audit and Internal Controls

1.  Meet at least annually in separate executive sessions with each of management, the personnel responsible for the internal audit function, and the independent auditor.

2. Review the activities, performance, staffing, budget, annual internal audit plan (and any changes to such plan), and organizational structure (if applicable) of the internal audit function, as well as the qualifications of the personnel responsible for the internal audit function.

3. Review and discuss with management, the personnel responsible for the internal audit function and the independent auditor periodic reports prepared by the personnel responsible for the internal audit function, including the scope and results of any internal audit, and discuss any significant observations or recommendations to management and management's responses.

4. Instruct management, the independent auditor and the personnel responsible for the internal audit function that the Committee expects to be informed if there are any subjects that require special attention or if any significant deficiencies or material weaknesses to the system of internal control over financial reporting are identified.

5. Review any proposed material changes to the company's system of internal control over financial reporting with management, the independent auditor and the personnel responsible for the internal audit function, including any such changes proposed by management, the independent auditor or the personnel responsible for the internal audit function or adopted as a result of any significant deficiencies or material weaknesses.

6. Meet at least quarterly with management and the independent auditor to consider the integrity of the Company's financial reporting processes and controls, including the process by which the CEO and the CFO engage in due diligence for and execute the financial statement certifications required by the Sarbanes Oxley Act.

\*          \*          \*

## F. Risk Management

1. Meet at least annually to discuss with management the Company's major enterprise risk exposure, as delineated by the Board and management from time to time, and the steps management has taken to monitor and control such exposure, including the Company's policies, practices and plans with respect to enterprise risk assessment, enterprise risk management, crisis communications, disaster recovery and the risk of fraud.

2.  Discuss and review with management the Company's business insurance portfolio and the adequacy of the type and scope of coverage provided by such insurance portfolio relative to the risk exposure of the Company, including product liability insurance and general liability insurance. Review the Company's directors and officers ("D&O") insurance program.

3.  In coordination with the Compensation Committee, annually review the Company's compensation plans, programs and policies as they relate to risks that may have an impact on the Company's financial statements.

4.  Discuss with management the Company's policies and practices regarding (a) information management policies and procedures, (b) information systems and related infrastructure and (c) cybersecurity risk management and back-up policies, practices and infrastructure, including, to the extent related to the Company's financial reporting and accounting processes[.]

(Emphasis on original.)

80.     In violation of the Audit Committee Charter, Defendants McKee, Mason, Staple, and Tyree conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, Defendants McKee, Mason, Staple, and Tyree failed to maintain the accuracy of Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

81.     Assertio is a Delaware corporation based in Lake Forest, Illinois. Assertio describes itself as a "leading commercial pharmaceutical company bringing differentiated products to patients." Further, the Company touts a "robust portfolio of branded

prescription neurology, inflammation and pain medications" and notes its "interest[] in products across all therapeutic areas including [the Company's] current focus."[4] One of the Company's core commercial products is Indocin which is an oral or suppository drug that is purportedly used for the treatment of "[m]oderate to severe rheumatoid arthritis including acute flares of chronic disease, [m]oderate to severe ankylosing spondylitis, [m]oderate to severe osteoarthritis, [a]cute painful shoulder (bursitis and/or tendinitis), and [a]cute gouty arthritis."[5] However, there are no patents filed regarding Indocin, leaving the Company at risk of having competitors produce and sell generic versions of Indocin.

### **False and Misleading Statements**

### *March 8, 2023 Form 10-K*

82.     On March 8, 2023, Assertio filed the 2022 10-K with the SEC to report its financial results for the 2022 Fiscal Year, which was signed by Defendants Peisert, Schwichtenberg, Mason, McKee, Staple, and Tyree.

83.     The 2022 10-K provided a business overview of Assertio which stated, in relevant part:

> We are a commercial pharmaceutical company offering differentiated products to patients utilizing a non-personal promotional model. Our commercial portfolio of branded products focuses on three areas: neurology, rheumatology, and pain and inflammation. We have built our commercial portfolio through a combination of increased opportunities with existing products, as well as through the acquisition or licensing of additional approved products[.]

84.     Under the heading "Business Strategy," the 2022 10-K discussed the Company's strategy, specifically providing that:

---

[4] https://www.assertiotx.com/about/overview/
[5] https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=06de3c9d-63bf-47c1-f78c-4fbdd482928a##

Our success depends on our people, the unique and scalable digital platform we have created, and the opportunities that exist in the marketplace. We believe the following key elements enable us to be commercially successful:

- Leadership with a proven track record of successful results;
- significant experience in completing business development transactions in the healthcare space such as mergers, asset acquisitions, asset divestitures, and commercialization/licensing arrangements;
- a strategy that leverages digital and non-personal promotion to engage our customers and drive efficiency;
- experience in key elements of commercialization including, but not limited to, market access, patient services, distribution, brand and digital marketing, non-personal promotion, analytics, and market research
- impactful brand promise for physicians and patients that reduces hassle and improves accessibility through access programs; and
- commercial capabilities and financial position that enable us to seamlessly expand our product offerings.

Our strategy is to grow through product acquisitions, commercialization agreements, licensing or technology agreements, equity investments, and business combinations. Our products have been acquired or licensed through business development activities. We continue to seek additional products, with a preference for accretive, on-market products that have patent life or exclusivity remaining that we can add to our portfolio of medicines. Secondarily, we also remain open to late-stage assets or other investments into medical devices, informatics, or technology. We are seeking products that are a fit with our commercial platform and can be leveraged and distributed via digital and non-personal promotional means. Our platform is specialty area agnostic and we can potentially acquire products across a number of therapeutic areas, while requiring minimal additional resources.

85.    In discussing the Company's net product sales, the 2022 10-K stated that:

For the year ended December 31, 2022, product sales primarily consisted of sales from INDOCIN products, CAMBIA, Otrexup and SPRIX.

INDOCIN net products sales increased $39.8 million from $60.6 million for the year ended December 31, 2021 to $100.3 million for the year ended December 31, 2022, primarily due to favorable net pricing as a result of an increase in gross price and volume mix shift to more profitable channels, partially offset by lower volume.

86.     The 2022 10-K also appended Exhibits 31.1, 31.2, 32.1, and 32.2 which contained signed certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Peisert and Schwichtenberg attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

### *2023 Proxy Statement*

87.     On April 3, 2023, Assertio filed the 2023 Proxy Statement with the SEC notifying shareholders of the 2023 Annual Meeting of Shareholders, to be held on May 10, 2023. Defendants Mason, McKee, Peisert, Staple, and Tyree solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

88.     The 2023 Proxy Statement called for shareholder approval of, *inter alia*: (1) the reelection of Defendants Mason, McKee, Peisert, Staple, and Tyree to the Board; (2) the approval of an amendment and restatement of the Company's 2014 Omnibus Incentive Plan (the "Plan") to increase the number of shares available for issuance; (3) the approval of, on an advisory (non-binding) basis, the compensation of the Company's named executive officers; (4) to conduct, on an advisory (non-binding) basis, a vote on the preferred frequency of future advisory votes to approve the compensation of the Company's named executive officers; (5) the approval of an amendment to the Amended and Restated Certificate of Incorporation of Assertio Therapeutics, Inc. ("Therapeutics"), a wholly-owned subsidiary of the Company, to eliminate the pass-through voting provision that requires approval by both the Company and the Company's stockholders prior to

certain actions being taken by or at Therapeutics; and (6) the ratification of the appointment of Grant Thornton LLP as the Company' independent registered public accounting firm for 2023.

89.     As noted above, the 2023 Proxy Statement solicited shareholder approval for an additional 4,150,000 shares for issuance under the Plan (the "Plan Proposal"). The misrepresentations and omissions set forth herein were material to shareholders in voting on approval of the Plan Proposal who would not have approved the Plan Proposal had they been informed of the true financial state of the Company and the wrongdoing alleged herein. Under the Plan Proposal, the aggregate dollar value of shares of common stock subject to equity-based awards granted under the Plan during any calendar year to any one non-employee director may not exceed $600,000. However, as mentioned above for the 2022 Fiscal Year, Defendants Mason, McKee, Staple, and Tyree received $283,192, $276,692, $298,192, and $265,692, respectively, in total compensation from the Company.

90.     Regarding the Plan's purpose, the 2023 Proxy Statement represented that the Plan "was to designed to attract and retain employees, non-employee directors and consultants of the Company and its subsidiaries, to encourage the sense of proprietorship of such employees, consultants and directors and to stimulate the active interest of such persons in the development and financial success of the Company and its subsidiaries by making awards that provide participants with a proprietary interest in the growth and performance of the Company and its subsidiaries." The 2023 Proxy Statement further represented that the Plan is administered by the Compensation Committee, with the Compensation Committee selecting the participants and determining the type or types of awards and the number of shares to be optioned or granted under the Plan.

91.     The 2023 Proxy Statement also represented that, as of March 31, 2023,

"413,471 shares remained available for issuance under the 2014 Plan. There were no shares

available to grant under prior incentive plans. If the Company is unable to grant competitive

equity awards, it may be required to offer additional cash-based incentives to replace equity

as a means of competing for or retaining talent. This in turn could impact the ability of the

Company to achieve its financial goals."

92.     With respect to the Board's Role in Risk Oversight, the 2023 Proxy

Statement stated the following:

> The Board oversees the establishment and maintenance of the Company's
> risk management processes. The Board's role in the Company's risk
> oversight process includes receiving regular updates from members of
> senior management on areas of material risk to the Company, including
> commercial sales, clinical and medical affairs, regulatory matters, research
> and development, supply chain, human resources, finance, legal and
> compliance, information management and technology, environmental,
> social and governance matters and strategic and reputational matters. The
> full Board (or the appropriate Committee in the case of risks that are under
> the purview of a particular Committee) receives these updates to enable it
> to understand the Company's risk profile and the Company's risk
> identification, risk management and risk mitigation strategies. When a
> Committee receives the update, unless all directors participated in the
> relevant Committee meeting, the Chairman of the relevant Committee
> provides an update on the discussion to the full Board at the next Board
> meeting. This enables the Board and its Committees to coordinate the risk
> oversight role.
>
> The Board delegated primary responsibility for oversight of specific risks
> to its committees. Specifically, the Audit Committee assists the Board in
> fulfilling its oversight responsibilities with respect to risk in the areas of
> financial reporting and internal controls, investment policy, tax planning,
> enterprise risk management, product and general liability insurance,
> compliance with applicable laws and regulations and related party
> transactions. The Audit Committee also discusses with management the
> Company's policies and practices regarding information management
> policies and procedures, information systems and related infrastructure and
> cybersecurity risk management and back-up policies, practices and
> infrastructure, including, to the extent related to the Company's financial
> reporting and accounting processes, insider trading and director and officer

insurance. The Compensation Committee assists the Board in fulfilling its oversight responsibilities with respect to the management of risks relating to the Company's compensation plans, program and policies, benefit plans, succession planning and corporate culture, as well as oversight of other risks associated with the Compensation Committee's responsibilities under its charter. The Nominating and Corporate Governance Committee assists the Board in fulfilling its oversight responsibilities with respect to the management of risks associated with matters overseen by the Nominating and Corporate Governance Committee, including corporate governance, director succession planning, reputational risk, political and charitable contributions and environmental and social responsibility, to the extent such risk arises from these topics.

93.     Regarding the Audit Committee's responsibilities, the 2023 Proxy

Statement stated the following:

*Audit Committee.* The Audit Committee has sole responsibility for appointing and terminating the Company's independent registered public accounting firm. In addition, the Audit Committee assists the Board in its oversight responsibilities to stockholders, specifically with respect to:
- the qualifications and independence of our independent registered public accounting firm and internal auditing function;
- financial statements and related disclosure matters;
- internal audit, internal controls and corporate risk management;
- investment policies, and tax planning and strategies;
- finance organization and operations;
- information technology and information management security, and related policies and practices;
- compliance, insider trading and related party transactions; and
- other related matters.

(Emphasis on original.)

94.     Regarding the Code of Conduct, the 2023 Proxy Statement stated the

following:

The Board has adopted a Code of Business Conduct and Ethics (Code of Ethics) that applies to all of the Company's employees, officers and directors, including its principal executive officer and its principal financial officer or persons performing similar functions. A copy of the Code of Ethics is available on the Company's website at www.assertiotx.com under the caption "Investors — Corporate Governance — Governance Documents" and any amendments to or waivers of the Code of Ethics will be posted to such website. We intend to disclose future amendments to

certain provisions of the Code of Ethics, and any waivers of the Code of Ethics granted to executive officers and directors, on the website within four business days following the date of the amendment or waiver.

95.     The 2023 Proxy Statement was materially false and misleading because it failed to disclose that, contrary to the 2023 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing and/or permitting the Company to issue false and misleading statements, and were not complying with the Code of Conduct.

96.     The 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company had overestimated the profitability of Indocin due to the FDA approval of a generic counterpart; (2) due to this miscalculation and the overall threat of generic competition, the Company's dependence on Indocin to boost its net income was not sustainable; (3) the Company's expansion of its portfolio to include Rolvedon would not positively impact the business' prospects and cash flow; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

97.     The 2023 Proxy Statement was also false and misleading because, despite assertions to the contrary, Assertio's Code of Conduct was not followed, as the Individual Defendants violated the Code of Conduct, including by allowing false and misleading statements to be issued to the investing public.

98.     As a result of Defendants Mason, McKee, Peisert, Staple, and Tyree causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Mason, McKee, Peisert, Staple, and Tyree to the Board,

thus allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the Plan Proposal, and the 4,150,000 shares of the Company's common stock for use thereunder.

***April 25, 2023 Press Release***

99.     On April 25, 2023, Assertio issued a press release announcing the Company's acquisition of Spectrum and, particularly, Rolvedon. The press included a statement from Defendant Peisert, who stated, in relevant part:

> The addition of Spectrum's commercial capabilities and ROLVEDON, a novel long-acting G-CSF product recently launched into a blockbuster market in October 2022, exemplifies Assertio's attractiveness as an acquirer of new, accretive assets across diverse therapeutic categories, and ability to continue their growth and achieve profitable contributions faster and more efficiently than could be achieved on a standalone basis. We intend to retain the majority of Spectrum's commercial infrastructure, which we believe is synergistic to our digital non-personal platform, deploying these complementary dual channels to support clinical messaging, reimbursement education and ROLVEDON awareness to further aid and accelerate its launch.

100.    The press release stated that the transaction "will deliver significant value to [] shareholders and the opportunity to share in the future upside of ROLVEDON." Further, the press release stated that the resulting "combined assets and commercial infrastructure will position [the Company] to accelerate ROLVEDON's launch for the benefit of patients, maximize its potential and drive further growth[.]"

101.    The press release also indicated some advantageous impacts that the transaction would provide for Assertio. Specifically, the press release stated that:

**Transaction Strategic and Financial Rationale**

**Strengthened Commercial Infrastructure and Resources:** Assertio's innovative digital non-personal sales model complements Spectrum's in-person commercial infrastructure, providing greater market access and resources than either company as a standalone entity.

**Expected to Be Accretive to Adjusted EPS and Operating Cash Flow in 2024:** Assertio intends to retain the majority of Spectrum's commercial team and add operating costs of approximately $60 million annually. The remaining cost synergies are expected to accelerate and enhance the profit opportunities for the combined company and generate double-digit accretion to adjusted EPS and increased operating cash flow in 2024.

**Enhanced IP Portfolio:** ROLVEDON's intellectual property protection is anticipated to extend through 2036, complementing Assertio's portfolio of traditional and non-traditional IP protection, including assets with protection extending beyond 2040 and plans to secure additional protections on existing assets.

**Improved Strategic Profile:** The transaction enables the combined company to have a more scalable and competitive infrastructure for continuing the development and acquisition of existing and prospective new commercial- and late development-stage products suited to Assertio's unique omni-channel sales strategy.

**Platform Diversification**: In addition to Assertio's key assets Indocin, Sympazan and Otrexup, Spectrum's key asset ROLVEDON will represent meaningful further asset diversification. ROLVEDON is a long-acting growth factor (G-CSF) indicated to decrease the incidence of infection, as manifested by febrile neutropenia, in adult patients with non-myeloid malignancies receiving myelosuppressive anti-cancer drugs associated with clinically significant incidence of febrile neutropenia.

**Access to Capital Markets:** With enhanced scale and greater diversification of revenue generating commercial assets, the combined company is expected to have a more attractive profile to investors and to benefit from greater access to the capital markets.

(Emphasis on original.)

### *May 9, 2023 Press Release*

102.    On May 9, 2023, the Company issued a press release announcing its financial results for the first quarter of 2023. The press release started with introductory remarks from Defendant Peisert who stated, in relevant part:

Since becoming CEO a little over two years ago, we adopted a strategy to increase profitability, improve our balance sheet, reduce our cost of capital, diversify our business and create internal and external opportunities for

growth. [] Through the adoption of our innovative digital non-personal sales model, significant growth and cash flow, the refinancing of our indebtedness and our most recent completed acquisition of Sympazan, we have achieved most of what we set out to do and put Assertio on a pathway for significant and sustainable growth over the coming years.

103.    The press release also provided an updated financial outlook, stating, in relevant part:

First quarter net product sales performed above internal expectations in what is typically a seasonally low quarter, delivering 18% growth in net product sales, more than $25 million of adjusted EBITDA and almost $23 million in cash flow from operations. Results were driven by continued growth of Indocin and the first full quarter of sales for Sympazan. As a result, the Company is raising its full-year net product sales and adjusted EBITDA outlook.

### May 9, 2023 Earnings Call

104.    Also on May 9, 2023, Assertio hosted an earnings call to discuss its financial results for the first quarter of 2023 ("Q123 Earnings Call"). In the call's introductory remarks, Defendant Peisert discussed Assertio's priorities regarding the Company's product portfolio. Specifically, Defendant Peisert stated, in relevant part:

[O]ur priority should not surprise -- should not be a surprise to anyone who has followed our company. They are, first, to continue to build improve the value of our non-personal commercial platform; second, to maintain INDOCIN and execute on the INDOCIN life cycle management initiatives; third, business development to execute on our M&A plans to diversify our portfolio and create future growth opportunities for the business.

*             *             *

With respect to INDOCIN, our goal as we entered the year was to maintain demand. We made some very impactful changes to the product by exiting from an unprofitable segment. To date, we've been able to retain the majority of those volumes and the team is incented to maintain the same level of volume as the prior year.

### July 27, 2023 Press Release

105.    On July 27, 2023, Assertio issued a press release announcing the approval of the proposed acquisition of Spectrum and its projected beneficial impact on the Company. Specifically, Defendant Peisert stated, in relevant part, that "[the Company] believe[s] this transaction provides extensive new growth opportunities and will be accretive to [Assertio] stockholders in 2024."

***July 31, 2023 Press Release***

106.    On July 31, 2023, Assertio issued a press release providing details regarding the closing of the Spectrum acquisition and in which Defendant Peisert, stated in relevant part:

> We are pleased to close the acquisition of Spectrum and its ROLVEDON®
> (eflapegrastim-xnst) Injection asset, as well as bring onboard an incredible
> commercial team with proven successful results. We believe this
> combination will expand and diversify Assertio's revenue base,
> complement our digital non-personal marketing capabilities and enhance
> our IP portfolio as we continue to scale our platform and its capabilities. We
> look forward to building on the successful early results in the
> ROLVEDON® (eflapegrastim-xnst) Injection launch for the remainder of
> 2023, driving the business toward our goal of accretive contribution to our
> Adjusted EPS and operating cash flow in 2024.

***August 3, 2023 FDA Approval of Generic Indocin***

107.    On August 3, 2023, Zydus received the approval of the FDA to manufacture and market a 50 mg, suppository generic Indocin. Further, the FDA classified the generic Indocin as a CGT drug product which triggered and granted to Zydus a 180-day exclusivity to market the product.

***August 3, 2023 Press Release***

108.    On the same day, August 3, 2023, Assertio issued a press release announcing the Company's financial results for the second quarter of 2023.

109.    The press release discussed the addition of Rolvedon in the Company's pharmaceutical portfolio and its likely contribution to Assertio's long-term growth strategy. Specifically, the Defendant Peisert stated the following:

> The acquisition of Spectrum Pharmaceuticals and its innovative ROLVEDON™ asset is transformative to our Company. ROLVEDON continues its exceptional launch trajectory as second quarter sales increased to $21.0 million[], from $15.6 million in the first quarter. We intend to maintain their highly effective commercial team to continue expanding on the success of this exciting new asset. We also expect to deploy this team's proven market access and contracting capabilities in support of our other assets, particularly Sympazan, Otrexup and Sprix. Once fully integrated, Assertio will benefit from a more diverse revenue base, greater intellectual property protection and an enhanced commercial capability in support of our long-term growth strategy.
>
> In the second quarter, we continued to deliver on our core growth, cash flow and portfolio diversification goals, all supported by our innovative and cost efficient digital non-personal sales model[.]

110.    The press release also acknowledged the FDA approval of the generic Indocin and revealed that "*Assertio [was] withdrawing its 2023 financial outlook to assess the recent news of a generic indomethacin suppository approved by the United States Food and Drug Administration*." (Emphasis added.)

111.    On this news, the Company's stock price fell $2.44 per share, or 45.61%, from closing at $5.35 per share on August 3, 2023, to close at $2.91 per share on August 4, 2023.

**August 3, 2023 Earnings Call**

112.    Also on August 3, 2023, the Company hosted an earnings call to discuss its financial results for the second quarter of 2023 ("Q223 Earnings Call").

113.    During the call's introductory remarks, Defendant Peisert discussed the acquisition of Spectrum, as well as the FDA approval of the generic Indocin, but drastically understated its impact on Assertio's Indocin. Specifically, Defendant Peisert stated that:

> The acquisition of Spectrum marks a significant turning point for Assertio, providing immediate diversification of revenues a sustainable near-term growth driver and long-term patent protection. The asset, the commercial infrastructure and sales model are also aligned with our vision of where we can effectively operate in this competitive pharmaceutical landscape our intelligent contracting and market access are the foundation of the go-to-market model.
>
> *                   *                   *
>
> Now with a healthier balance sheet and a growth asset, -- that discipline will still be there to help foster this company towards sustainable growth. **We've proven we can manage through the ups and downs of loss of exclusivity,** and we've built and now acquired a first-class commercial team from Spectrum. That can only enhance our capabilities to grow assets and scale.
>
> *                   *                   *
>
> Today, we're not able to provide guidance as we initially intended. We just learned a few hours ago, the FDA has approved a generic indomethacin product today. When we issue guidance, we like to have as much information at our disposal as possible and now we believe it's prudent to withdraw our outlook until we know more information.
>
> Today, all we know as a single competitor was approved and they received CGT status, which means no other generics can be approved for 180 days. We are not aware of their launch timing. **What I can offer is that Assertio is not afraid of this nor are we hiding from this. It has been well known that indomethacin had no intellectual property nor exclusivity protecting it and generic entry risk was always in the background**.
>
> **So we have been preparing for it, and we are ready to defend it**. One example of how we can defend is evident in our financials this year. As many of you know, we lost exclusivity for CAMBIA in January of this year and 3 competitive generics entered the market in addition to 1 authorized generic.
>
> Normally, in these situations, the brands do not do well in the first 6 to 9 months following [loss of exclusivity ("LOE")]. However, year-to-date, we've retained 36% to the prior year volumes and 34% of the prior year

revenues, which is an outstanding result when many of the analogs in a competitive market like this, would suggest retention rates near 10% of volume and between 0% to 10% of revenue, because of reduction in end customer inventory.

This is all due to the outstanding execution of our commercial team preparation for the LOE and the early identification that patient refills were still being covered by commercial insurers and quickly utilizing the resources in our hub and our patient support programs to encourage a high refill rate. An example of our market access programs and strategy at work. **We're confident that we can do something similar with INDOCIN. And in this case, we only have a single competitor and the analogs are far better than with 4 as was the case with CAMBIA.**

*           *           *

While the news today wasn't as comp and circumstances we had planned, and we certainly weren't aware that the generic was coming. But it does highlight our strategic need to diversify the business and why the merger of Spectrum was important.

We will have some short-term obstacles to overcome, but we are a strong and committed team, and we will overcome them. We are a far stronger company now than we were a few years ago. And I believe that we are well positioned to come through this even stronger and create value for all shareholders.

(Emphasis added.)

114.    The statements referenced above in ¶¶83-86, 99-106,108-109, and 113 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company had overestimated the profitability of Indocin due to the FDA approval of a generic counterpart; (2) due to this miscalculation and the overall threat of generic competition, the Company's dependence on Indocin to boost its net income was not sustainable; (3) the Company's expansion of its portfolio to include Rolvedon would not positively impact the business' prospects and cash flow; and

(4) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## **The Truth Emerges**

### *November 8, 2023 Press Release*

115.    On November 8, 2023, after the market closed, the Company issued a press release announcing its financial results for the third quarter of 2023. The press release also indicated the Company's revenue as of the end of September 2023 to $35,627,000 and an adjusted earnings per share (non-GAAP) of $0.01 which was significantly lower compared to the 2022 adjusted earnings per share (non-GAAP) of $0.22 for the same quarter.

116.    In the press release's introductory remarks, Defendant Peisert noted the Company's disappointment regarding its quarterly financial results. Specifically, Defendant Peisert stated that:

> Our third quarter results were disappointing, with the loss of Indocin exclusivity and Rolvedon results below expectations driving significant charges to our net income. While we are learning that certain aspects of the acquisition may not be everything we initially expected, we did not buy Spectrum just for the third quarter. The addition of Rolvedon diversifies and extends our portfolio's duration, plus brings improved commercial access and business-to-business contracting teams that are important to our strategic direction. We have taken immediate steps to improve the business and remain committed to building a strategic path for Rolvedon's long-term sustainable growth.

> Despite these headwinds, Assertio's innovative non-personal platform continues to drive profitable growth on our other assets. Sympazan achieved another new monthly high on a 4% increase in total prescription volume quarter over quarter, and new payor coverage drove volumes and Net Product Sales for Otrexup up 4% and 6%, respectively, for the nine months year-to-date. We have built this platform to scale and accommodate assets across a variety of therapeutic categories as we continue to pursue additional licensing and acquisition opportunities that can leverage these capabilities, bringing further value to Assertio and capitalizing on our existing liquidity.

117.     On this news, the Company's stock price fell $0.92 per share, or 43.19%, from closing at $2.13 per share on November 8, 2023, to close at $1.21 per share on November 9, 2023.

118.     Furthermore, on January 3, 2024, the Company issued a press release announcing a leadership transition in which Defendant Peisert stepped down as Assertio's CEO. In turn, Defendant Mason was appointed as the interim CEO while the Company continued its search for a permanent CEO.

119.     On this news, the Company's stock price fell $0.11 per share, or 10.89%, from closing at $1.01 per share on January 3, 2024, to close at $0.90 per share on January 4, 2024.

## **DAMAGES TO ASSERTIO**

120.     As a direct and proximate result of the Individual Defendants' conduct, Assertio has lost and expended, and will continue to lose and expend, many millions of dollars.

121.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

122.     Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

123.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

124.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

125.   As a direct and proximate result of the Individual Defendants' conduct, Assertio has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

126.   Plaintiff brings this action derivatively and for the benefit of Assertio to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Assertio, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

127.   Assertio is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

128.   Plaintiff is, and has been at all relevant times, a shareholder of Assertio. Plaintiff will adequately and fairly represent the interests of Assertio in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

129.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

130.    A pre-suit demand on the Board of Assertio is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following six individuals: Defendants Mason, McKee, Staple, Tyree, and Vacirca (the "Director Defendants") along with nonparty Sravan Emany (collectively, with the Director Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to three of the six Directors who are on the Board at the time this action is commenced.

131.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. Furthermore, while the price of the Company's stock was artificially inflated by their misconduct, three of the Director Defendants (Defendants Mason, McKee, and Tyree) further breached their fiduciary duties by engaging in improper insider sales of the Company's common stock while its stock price was artificially inflated due to the misstatements discussed herein, which further demonstrates their motives for facilitating and participating in the scheme. All of the above renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

132.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted Assertio to issue materially false and

misleading statements. Specifically, the Director Defendants caused Assertio to issue false and misleading statements which were intended to make Assertio appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

133.     Additional reasons that demand on Defendant Mason is futile follow. Defendant Mason has served as a Company director since February 2019. She also has served as the Company's Interim CEO since January 2, 2024. As such, the Company provides Defendant Mason with her principal occupation for which she receives lucrative compensation. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Defendant Mason also signed, and thus personally made, the false and misleading statements in the 2022 10-K. She also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to her re-election, along with the re-election of Defendants Peisert, McKee, Staple, and Tyree to the Board. Moreover, her insider sales made before the fraud was exposed yielded approximately $651,788 in proceeds and demonstrate her motive in facilitating and participating in the scheme. For these reasons, too, Defendant Mason breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

134.    Additional reasons that demand on Defendant McKee is futile follow. Defendant McKee has served as a Company director since March 2017. He also serves as the Chair of the Audit Committee, as Chair of the Nominating and Corporate Governance Committee, and as a member of the Compensation Committee. Defendant McKee received and continues to receive handsome compensation for his role as a director, including $276,692 in 2022. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant McKee also signed, and thus personally made, the false and misleading statements in the 2022 10-K. He also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election, along with the re-election of Defendants Peisert, Mason, Staple, and Tyree to the Board. Moreover, his insider sales made before the fraud was exposed yielded $69,080 in proceeds and demonstrate his motive in facilitating and participating in the scheme. For these reasons, too, Defendant McKee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135.    Additional reasons that demand on Defendant Staple is futile follow. Defendant Staple has served as a Company director since November 2003. He also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Staple received and continues to receive handsome compensation for his role as a director, including $298,192 in 2022. As a trusted Company

director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Staple also signed, and thus personally made, the false and misleading statements in the 2022 10-K. He also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election, along with the re-election of Defendants Peisert, Mason, McKee, and Tyree to the Board. For these reasons, too, Defendant Staple breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136.    Additional reasons that demand on Defendant Tyree is futile follow. Defendant Tyree has served as a Company director since October 2016. He also serves as the Chair of the Compensation Committee. He received and continues to receive handsome compensation for his role as a director, including $265,692 in 2022. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Tyree also signed, and thus personally made, the false and misleading statements in the 2022 10-K. He also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election, along with the re-election of Defendants Peisert, Mason, McKee, and Staple to the Board. Moreover, his insider sales made before the fraud was exposed yielded $258,858 in proceeds and demonstrate his motive in facilitating and participating in the

scheme. For these reasons, too, Defendant Tyree breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137.   Additional reasons that demand on Defendant Vacirca is futile follow. Defendant Vacirca has served as a Company director since July 2023. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, too, Defendant Vacirca breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138.   Additional reasons that demand on the Board is futile follow.

139.   Defendants McKee (as Chair), Mason, Staple, and Tyree (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit

Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

140.     Moreover, Defendants Mason, McKee, Staple, and Tyree solicited the 2023 Proxy Statement which, *inter alia*, called for shareholders to approve the Plan Proposal. The 2023 Proxy Statement solicited shareholder approval for the Plan, including the 4.15 million shares to be issued in connection therewith. The misrepresentations and omissions set forth herein were material to shareholders in voting on approval of the Plan Proposal who would not have approved the Plan Proposal had they been informed about the wrongdoing alleged herein. Under the Plan Proposal, the aggregate dollar value of shares of common stock subject to equity-based awards granted under the Plan during any calendar year to any one non-employee director could not exceed $600,000. However, as mentioned above for the 2022 Fiscal Year, Defendants Mason, McKee, Staple, and Tyree received $283,192, $276,692, $298,192, and $265,692, respectively, in total compensation from the Company. Because Defendants Mason, McKee, Staple, and Tyree solicited approval for the Plan which, *inter alia*, could have nearly doubled their total annual compensation, demand is futile as to them and, thus, excused. Moreover, as set forth below, Defendants Mason, McKee, Staple, and Tyree were beholden to those among them who served on the Compensation Committee.

141.     Defendants Mason, McKee, and Tyree (the "Compensation Committee Directors") served as members of the Compensation Committee during the Relevant Period. The Compensation Committee Directors solicited shareholder approval of the Plan Proposal, which granted them the right to determine how many shares of Company common stock to administer under the Plan to non-employee directors, including

themselves. They all stood to benefit from, and did benefit from, shareholder approval of the Plan Proposal, which Company shareholders were deceived into approving while the Individual Defendants made false and misleading statements. Thus, non-employee Director Defendant Staple was beholden to the Compensation Committee Directors, and the Compensation Committee Directors were beholden to each other, because they would not take action against the very directors who held the authority to award them nearly double their total annual compensation pursuant to the Plan Proposal. These conflicts of interest precluded the Compensation Committee Directors and the rest of the Director Defendants from calling into question the Director Defendants and other Individual Defendants' conduct. Thus, demand upon the Compensation Committee Directors would be futile.

142.    In violation of the Code of Conduct, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

143.    Assertio has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Assertio any part of the damages Assertio suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

144.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

145.    The acts complained of herein constitute violations of fiduciary duties owed by Assertio's officers and directors, and these acts are incapable of ratification.

146.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Assertio. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the

"insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Assertio, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

147.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Assertio to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

148.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

149.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

150.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or

appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

151.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

152.    Under the direction and watch of the Individual Defendants, the 2023 Proxy Statement failed to disclose that, contrary to its descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing and/or permitting the Company to issue false and misleading statements, and were not complying with the Code of Conduct.

153.    Under the direction and watch of the Defendants Peisert, Mason, McKee, Staple, and Tyree, the 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company had overestimated the profitability of Indocin due to the FDA approval of a generic counterpart; (2) due to this miscalculation and the overall threat of generic competition, the Company's dependence on Indocin to boost its net income was not sustainable; (3) the Company's expansion of its portfolio to include Rolvedon would not positively impact the business' prospects and cash flow; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

154.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statements, including but not limited to, the election of directors.

155.    The false and misleading elements of the 2023 Proxy Statement led Company shareholders to, *inter alia*, (1) re-elect Defendants Peisert, Mason, McKee, Staple, and Tyree to the Board, allowing them to continue to breach their fiduciary duties to the Company; and (2) approve the Plan Proposal.

156.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

157.    Plaintiff, on behalf of Assertio, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

158.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

159.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Assertio's business and affairs.

160.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

161.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Assertio.

162.    In breach of their fiduciary duties owed to Assertio, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company had overestimated the profitability of Indocin due to the FDA approval of a generic counterpart; (2) due to this miscalculation and the overall threat of generic competition, the Company's dependence on Indocin to boost its net income was not sustainable; (3) the Company's expansion of its portfolio to include Rolvedon would not positively impact the business' prospects and cash flow; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

163.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

164.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

165.    In yet further breach of their fiduciary duties, during the Relevant Period, Defendants Peisert, Schwichtenberg, Mason, McKee, and Tyree engaged in lucrative

insider sales of Company stock at artificially inflated prices before the fraud was exposed, netting proceeds of approximately $1,781,378.

166.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Assertio's securities and disguising insider sales.

167.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Assertio's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

168.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

169.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Assertio has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

170.    Plaintiff, on behalf of Assertio, has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

171.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Assertio.

173.    The Individual Defendants either benefitted financially from the improper conduct and their making insider sales or received profits, bonuses, stock options, or similar compensation from Assertio that was tied to the performance or artificially inflated valuation of Assertio, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

174.    Plaintiff, as a shareholder and a representative of Assertio, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual

Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

175.    Plaintiff, on behalf of Assertio, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

176.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

177.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Assertio, for which they are legally responsible.

178.    As a direct and proximate result of the Individual Defendants' abuse of control, Assertio has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

179.    Plaintiff, on behalf of Assertio, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

180.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

181.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Assertio in a manner consistent with the operations of a publicly held corporation.

182.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Assertio has sustained and will continue to sustain significant damages.

183.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

184.    Plaintiff, on behalf of Assertio, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

185.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

187.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Assertio to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

188.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

189.    Plaintiff, on behalf of Assertio, has no adequate remedy at law.

## SEVENTH CLAIM

**Against Defendants Peisert and Schwichtenberg for Contribution Under Sections 10(b) and 21D of the Exchange Act**

190.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

191.     Assertio and Defendants Peisert and Schwichtenberg are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Peisert and Schwichtenberg's willful and/or reckless violations of their obligations as officers and/or directors of Assertio.

192.     Defendants Peisert and Schwichtenberg, because of their positions of control and authority as officers and/or directors of Assertio, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Assertio, including the wrongful acts complained of herein and in the Securities Class Action.

193.     Accordingly, Defendants Peisert and Schwichtenberg are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

194.     As such, Assertio is entitled to receive all appropriate contribution or indemnification from Defendants Peisert and Schwichtenberg.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Assertio, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Assertio;

(c)     Determining and awarding to Assertio the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Assertio and the Individual Defendants to take all necessary actions to reform and improve Assertio's corporate governance and internal procedures to comply with applicable laws and to protect Assertio and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Assertio to nominate at least three candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Assertio restitution from Individual Defendants, and each of them;

        (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

        (g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

Of Counsel:

**FARNAN LLP**

**THE BROWN LAW FIRM, P.C.**

Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com